**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

<u>PUBLISH</u>

**SEP 7 1999**

**UNITED STATES COURT OF APPEALS**

**TENCH CIRCUIT**

**PATRICK FISHER**
**Clerk**

---

CAROLINE G. SCHULER

    Plaintiff-Appellee,

v.

CITY OF BOULDER, a Colorado
municipal corporation,

    Defendant,

ALAN QUILLER and LINDA
KOTOWSKI,

    Defendants-Appellants.

No. 98-1086

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 96-Z-2896)**

---

Cathy Havener Greer, Ritsema & Lyon, P.C., Denver, Colorado ( and Malcom S. Mead, Hall
& Evans, L.L.C., Denver, Colorado, with her on the briefs), for Defendants-Appellants.

Ronald D. Jung, Jung & Assoc., P.C., Boulder, Colorado, for Plaintiff-Appellee.

---

Before **BRORBY, HOLLOWAY** and **BRISCOE,** Circuit Judges.

---

**HOLLOWAY,** Circuit Judge.

1

This controversy concerns a First Amendment claim of Plaintiff-Appellee Caroline Schuler, inter alia, against her employer, the City of Boulder, Colorado, and two of her superiors. A defense of qualified immunity asserted by these two individual defendants was rejected below, and this appeal followed.

I

A

Schuler is a former employee of the City of Boulder, working full-time as a "facilities service assistant" for the Parks and Recreation Department's North Boulder Recreation Center (NBRC). I App. (tab 1 at 1; tab 2 at 1). Schuler's supervisor at the NBRC was defendant Alan Quiller. NBRC's manager, defendant Linda Kotowski, who was the Recreation Superintendent for the Parks and Recreation Department, was Quiller's supervisor. I App. (tab 1 at 1).

In November 1994 Schuler became concerned whether a janitor at the NBRC was spying on women from a crawlspace in the ceiling above the women's locker room. Schuler told Kotowski of her suspicions, III App. (tab A at 242-43), and Kotowski informed the Boulder police and instructed Schuler not to discuss her suspicions with anyone else, including Quiller.[1] III App. (tab B at 143; tab C at 43). On December 15,

---

[1] The record indicates that Quiller and the janitor were personal friends. III App. (tab A at 302-03; tab J at 7).

1994, Schuler telephoned the police, who came to the NBRC, investigated the scene and detained the janitor on suspicion of third degree sexual assault. I App. (tab 3 at 5). Charges were not filed against the janitor but the police continued an investigation. II App. (tab 2 at 229).

Immediately following the incident, a committee was established to investigate the matter and determine a course of action. I App. (tab 3 at 5). Quiller was made the chairman of the committee. After conducting the investigation, the committee recommended that the janitor not be terminated but be suspended without pay for two weeks. I App. (tab 3 at 6). Quiller accepted the recommendation and suspended the janitor.

During this time, NBRC employees were cautioned not to spread rumors about the "peeping Tom" incident. III App. (tab F at 4). Schuler, who believed that the janitor should have been terminated from his position, expressed her dissatisfaction in a seven page memorandum to Kotowski. . II App. (tab at 421); III App. (tab J at 1-7). In particular, Schuler voiced concern over Quiller's objectiveness in handling the investigation because of his personal friendship with the janitor. III App. (tab A at 302-03; tab J at 7). Moreover, Schuler found inconsistencies between the Review Committee's report and the police report regarding the incident. III App. (tab J at 2).

Prior to the "peeping Tom" incident, Quiller had promoted Schuler to the position of daytime facilities services assistant, which included the responsibilities of

bookkeeping, payroll and charge-back duties for NBRC. Schuler did not begin her work as daytime facilities service assistant until after the janitor's arrest. When she started her new position, she discovered that the bookkeeping duties had been given to a newly hired evening facilities service assistant. Schuler viewed the removal of the duties as a "slap in the face." III App. (tab A at 44).

On January 10, 1995, Quiller called Schuler into his office and verbally berated her for approximately an hour. II App. (tab 1 at 159-60). Quiller told Schuler that he believed he could no longer work with Schuler and suggested she find another job. Schuler left the meeting in tears, III App. (tab A at 230-31; tab F at 3), and on January 13, 1995, submitted a complaint form, through her union representative, against Quiller. III App. (tab A at 324).

At a farewell party for a colleague, Schuler discussed with other NBRC employees the "peeping Tom" incident. II App. (tab 1 at 408). Following the party, on January 24, 1995, Schuler received a written reprimand, I App. (tab 1 at 23), while the others who participated in the discussion were not reprimanded. III App. (tab F at 5). Schuler contacted an attorney, who contacted Boulder's City Attorney's Office on April 7, 1995. Following the communication between Schuler's counsel and the City Attorney's Office, the written reprimand was withdrawn from Schuler's personnel file. III App. (tab A at 437-38).

On March 1, 1995, Kotowski met with Schuler regarding the "peeping Tom"

4

incident. Kotowski told Schuler not to discuss the incident with others but to write a memorandum outlining Schuler's views about the committee's findings. Schuler submitted the memorandum on March 13, 1995. III App. (tab J at 1). Schuler met with Kotowski and Quiller two days later to discuss Schuler's scheduled performance review. III App. (tab A at 347). Schuler received poor marks. III App. (tab K at 5-10). Her review was also the lowest of any facilities services assistant within the previous five years.[2] Other employees who saw Schuler's review believed that her evaluation contained false and negative statements regarding Schuler's job performance. III App. (tab H at 4). Schuler filed a grievance to have the evaluation removed from her personnel file. III App. (tab M at 1).

On May 25, 1995, a local television station conducted an investigation of the "peeping Tom" incident. III App. (tab A at 74). The station interviewed Schuler and attempted to interview the janitor. The same day as the television interview, Kotowski notified Schuler that Schuler was to be transferred to a different recreation center effective June 5, 1995. I App. (tab 2 at 9). The transfer did not affect Schuler's title, compensation or duties. I App. (tab 1 at 62, 122). However, Schuler stated she did not want to leave her position. III App. (tab A at 481). Moreover, the involuntary transfer appeared to be contrary to city policy for filling such vacancies. III App. (tab E at 14-15).

---

[2]Schuler's score was lower than the janitor's score covering the two weeks he was suspended for the "peeping Tom" incident. III App. (tab B at 402).

On June 23, 1995, Schuler filed a grievance to protest the involuntary transfer. I App. (tab 1 at 10; tab 2 at 10). During Schuler's last day at NBRC, Quiller called Schuler into his office, III App. (tab B at 405) and, with another NBRC employee present, verbally chastised her. III App. (tab A at 129; tab C at 114). Schuler was then transferred to the East Boulder Recreation Center (EBRC). Schuler stayed with EBRC at that point but then resigned in August 1996.

B

In November 1996, Schuler filed the instant suit against the City of Boulder, Quiller and Kotowski, alleging unconstitutional retaliation against her in violation of her First Amendment rights, wrongful discharge, violation of rights under the Colorado Constitution and breach of express and implied contracts. In May 1997, a motion for summary judgment was filed by Quiller and Kotowski, asserting qualified immunity, inter alia. As noted below, the district judge dismissed the claim for constructive discharge and certain contract claims but denied the motion with respect to the First Amendment claim, rejecting the qualified immunity defense.

The judge said the question before her was whether Schuler had a First Amendment right to make certain statements critical of Schuler's government employer, the City of Boulder, and two of her supervisors and whether that right was clearly established at the time defendants took purported adverse employment actions against Schuler. The judge stated that:

Now what we do have and what will withstand summary judgment scrutiny is the first claim. The question is whether she had a First Amendment right to make the statements she did, and whether those are protected and whether those rights outweighed defendants' interest in keeping an even or productive office environment, and they do. First Amendment rights are important. It appears to the Court that there is no-- on the first claim--no qualified immunity defense. It certainly has been known for a long time, and it is well established that employees can speak out and exercise First Amendment rights and cannot have discriminatory actions taken against them because of this, so as far as the first claim is concerned, the first claim stands . . .

I App. (tab 12, p. 6). An unpublished written order granting in part and denying in part the motion for summary judgment with respect to Schuler's First Amendment rights was entered on February 19, 1998. I App. (tab 11). The claim for constructive discharge and certain contract claims were dismissed.

Quiller and Kotowski filed the instant appeal challenging the district court's order which denied their qualified immunity defense and held that their actions taken against Schuler violated clearly established constitutional rights of Schuler. As we explain below, this appeal turns, however, on whether the defendants' actions as alleged by Schuler amounted to unconstitutional retaliatory infringements on Schuler's First Amendment rights. Schuler's right to speak out in criticism of defendants' actions is not the real area of dispute here. We have jurisdiction of the appeal pursuant to 28 U.S.C. § 1291 under the collateral order doctrine, Mitchell v. Forsyth, 472 U.S. 511 (1985), and affirm.

7

## II

## A

The central issue before us is whether the allegedly retaliatory actions of defendants Quiller and Kotowski violated plaintiff Schuler's clearly established First Amendment rights.  The critical time frame begins in January 1995 when Quiller suspended the janitor for two weeks without pay.  I App. (tab 1 at 20).  Shortly thereafter Quiller called Schuler into his office and had an angry discussion with Schuler.  Then on January 20 at a party for city employees, Schuler discussed the "peeping Tom" incident and questioned the response that had been made to the incident.  On January 24, Kotowski gave a reprimand verbally to Schuler and a written memorandum to Schuler cautioning that "any further breaches of confidentiality will be addressed by further discipline."  I App. (tab 1 at 23).  Thus it is the early part of 1995 on which we  must focus to determine what was "clearly established" in the constitutional decisions on the First Amendment rights of a party such as Schuler.

For some years before this critical time period it had been settled that a State could not condition public employment on a basis that infringes the employee's protected interest in freedom of expression.  Connick v. Myers, 461 U.S. 138, 142 (1983); Pickering v. Board of Education, 391 U. S. 563, 568 (1968).  The protected freedom of expression of public employees includes their interests as citizens "in commenting upon matters of public concern."  The defendants do not raise any question under the Pickering

balancing test by which the employee's right to speak on matters of public concern is balanced against the government employer's interest in efficiency. Pickering, 391 U.S. at 568; Summary of Argument, Appellant's Opening Brief at 8-9. We are satisfied that Schuler's speech meets the "public concern" test. See Prager v. LaFaver, 1999 WL 390859 *1, *4 (10th Cir. 1999)("'Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of [public] officials, in terms of content, clearly concerns matter of public import.'")(quoting Conaway v. Smith, 853 F.2d 789, 796 (10th Cir. 1988)).

Instead of contending that matters of public concern were not touched upon by Schuler's criticisms of the defendants' handling of the "peeping Tom" incident, defendants argue that their alleged retaliatory actions against Schuler were not sufficiently onerous to rise to the level of clearly established constitutional violations of Schuler's First Amendment rights. Appellants' Opening Brief at 8-9. Defendants maintain that it was unclear in 1995 and remains unclear today whether the alleged conduct they took against Schuler rose to the level of a constitutional violation. Id. We disagree.

B

While the defendants say the district judge applied an incorrect standard in finding what law was clearly established, we perceive no uncertainty on this question. We have said that a right is "clearly established" when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."

Horstkoetter v. Department of Public Safety, 159 F.3d 1265, 1278 (10th Cir. 1998) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  The plaintiff need not show that the very action in question was previously held unlawful, but she must demonstrate that there is a Supreme Court or Tenth Circuit decision on point, or that the clearly established weight of authority from other courts is the law, as the plaintiff maintains. Horstkoetter, 159 F.3d at 1278.  We require some, but not identical, correspondence between the cases cited and the factual situation in the case at hand.  Id.

Plaintiff relies on Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990).  There the Court determined that a government employer's conduct in retaliation against the exercise of a protected right may be actionable when it involves promotion, transfer, recall after layoff, and hiring decisions, although not amounting to termination of employment or the substantial equivalent of dismissal.  Id. at 75.  The employer's actions which were challenged were decisions based on party affiliation or support.  The Court held:

> We therefore determine that promotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees.

Id. at 75.

We are satisfied that this court's application of the protective principles from Rutan had clearly established the contours of First Amendment rights so as to cover plaintiff Schuler's actions as of the critical time frame in 1995 for this case.  In Dill v.

10

City of Edmond, 155 F.3d 1193, 1204-05 (10th Cir. 1998), we decided that in June 1992, the protected nature of a police officer's First Amendment rights was such that when he spoke out about the existence of exculpatory evidence concerning a murder case, he was protected from retaliatory actions in transferring him from a detective position to patrol officer. In Dill, we cited Rutan and Wren v. Spurlock, 798 F.2d 1313, 1318 (10th Cir. 1986), and held that in June 1992, the law was clearly established so as to defeat a qualified immunity defense there.

We further noted in Dill that Rutan had made clear that there were deprivations less harsh than dismissal which nevertheless violated a public employee's rights under the First Amendment. Dill, 155 F.3d at 1205. In Morfin v. Albuquerque Public Schools, 906 F.2d 1434 (10th Cir. 1990), the plaintiffs were school teachers who filed a grievance against the school's principal and made complaints concerning the principal to one defendant, the principal's supervisor. The plaintiffs were subjected to substantial harassment and abuse, one being transferred to another school and another not having her contract renewed. We held that such conduct on the part of the defendants violated the plaintiffs' protected First Amendment right of free speech. Id. at 1437-38. We rejected the defendants' apparent position that "only adverse employment decisions, such as termination, suspension, or transfer, in retaliation for constitutionally protected speech are illegal. Actions short of an actual or constructive employment decision can in certain circumstances violate the First Amendment." Id. at 1437, n. 3.

11

In the instant case the record shows that defendants retaliated against plaintiff Schuler by:

(1)     removing job duties from Schuler, "specifically payroll which is important to get accurate." III App. (tab A at 43-45);

(2)     giving Schuler a written "reprimand," dated January 24, 1995 referring to Schuler's talking about the incident at NBRC with several other staff members. I App. (tab 1 at 23);

(3)     giving Schuler a low score on her performance evaluation, below that received by the janitor while he was suspended. III App. (tab K at 5-10); and

(4)     involuntarily transferring Schuler to another facility, the East Boulder Recreation Center, although with the same title and responsibilities. I App. (tab. 1 at 62); III App. (tab A at 528-29).[3]

We are convinced that under the holding of Rutan, and our precedents which we have analyzed, it was clearly established as of 1995 that the defendants' alleged conduct in retaliation for Schuler's protected speech was actionable. Hence the district judge properly rejected the qualified immunity defense and properly denied the defendants' motion for summary judgment on Schuler's First Amendment claim. Accordingly her order denying summary judgment is **AFFIRMED.**

---

[3]The fact that Schuler subsequently enjoyed her new position does not defeat her First Amendment claim for the action taken against her earlier. At the time the defendants transferred Schuler, she did not want to be moved to the new facility.

12