**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 3, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

VALERIE ALETTEA VANN,

       Plaintiff - Appellant,

v.

SOUTHWESTERN BELL
TELEPHONE COMPANY,

       Defendant - Appellee.

No. 05-5034

(N.D. Oklahoma)

(D.C. No. 03-CV-288-JOE-SAJ)

---

**ORDER AND JUDGMENT**[*]

---

Before **McCONNELL**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

Valerie Vann, an African-American, resigned her position at Southwestern Bell Telephone Co. after an unsuccessful attempt to transfer to a different position in another city. She subsequently filed a claim against Southwestern Bell under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, alleging that the company's decision that she must return to her former position was based

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

on race discrimination and resulted in her constructive discharge. The district court entered summary judgment on behalf of Southwestern Bell, and Vann appealed. For the reasons set forth below, we affirm.

## BACKGROUND

Vann began working in Southwestern Bell's Wichita, Kansas, call center in April 1997 as a residential sales service representative. As a new hire, she was required to pass a four-month training program for the residential sales position. After two or three years in that position, Vann transferred to a business billing position, also in Wichita, and again went through a three- or four-month training program. Less than a year later, Vann transferred again to a business sales position and was required to pass a third training program focusing on business sales. Vann passed that training program and began working in business sales in the Wichita office in late 2000. However, after Vann had been in that position for two or three months, Southwestern Bell merged its Wichita business sales office into its business billing office, and Vann returned to handling primarily billing inquiries.

In April 2002, Vann submitted a Job Vacancy Request, asking to transfer to Southwestern Bell's Tulsa office for personal reasons. Specifically, Vann sought the transfer so that she could better take care of her mother, who lived in Tulsa

and had become ill.  Under Southwestern Bell's personnel policies, employees may seek transfers for personal reasons but "may request only lateral and/or downgraded jobs," and, if transferred, they may not ask to return, or "retreat," to their former position, as would be allowed for other types of transfers.  Appellant's App. Vol. I at 193.  The policies also state that, in the case of such transfers, "[r]elocation expenses are not applicable." Id.  As with all transfers, however, the company may initiate a retreat of a transferred employee "on the basis of unsatisfactory performance in the new job" within six months of the transfer. Id. at 179.  According to Southwestern Bell managers, this retreat policy also applies to transferred employees who fail initial training requirements.

The Job Vacancy Request form, signed by Vann, stated that she "must meet all qualifications as indicated on the applicable job brief to be considered for possible placement." Id. at 204.  After Vann's Request was approved, she was informed that the Tulsa Select Business Accounts ("SBA") department had an open service representative position, with the same pay and benefits as the position Vann currently held in Wichita but primarily involving sales to business customers.  The general job description for service representative indicates that "[c]ompletion and satisfactory performance in job-related training" is a qualification requirement and that "[i]nitial extensive classroom training" is conducted. Id. at 207.  In addition, the Job Offer that Vann received indicated

that the applicable training hours would be 8 a.m. to 5 p.m., Monday through Friday. Vann agreed to accept this position and reported to work in Tulsa on April 28, 2002.

On her first day at the Tulsa call center, Vann was put into a training room with other transferees, some of whom had also previously held service representative positions, though in residential rather than business sales. Because Vann had prior training in business sales, she had a separate discussion with the managers, during which Vann indicated that she was not yet comfortable explaining some of the more complex business products to customers. It was decided that Vann would attend the same training program that the other transferees were attending.

In general, as had been the case with the previous training programs Vann had attended, the transferees were required to pass the Tulsa training program, including a number of skills demonstration tests conducted during the course of the program, as a condition of continuing in the business sales position. However, Vann disputes that she understood at this point that she would be required to pass the training program. In her view, because she had already passed a training program in business sales, she was merely sitting in on the Tulsa training as a refresher course. The record indicates that at some point after the skills demonstration tests began, Vann questioned why she was required to

-4-

participate in the tests. At that time, Vann was told that she would be required to pass the training program, including its series of tests.

Vann passed the first two skills demonstration tests, which were conducted as role plays. However, during the second of these tests, the students were given the option of avoiding a formal test if they performed well enough in informal role plays in class. While the formal test was accordingly waived for a majority of the students, Vann and two others (one Caucasian and one Hispanic) were required to take the formal test. The third test, which took place on July 2, 2002, approximately ten weeks into the training program, involved handling live calls from actual customers. According to Vann, the training class was surprised to be given live calls on that day, and the students were not told that this was a test; rather, they were told that the managers simply wanted to observe how they handled customers. However, Vann acknowledges that, after the second live call she handled that day, she had a meeting with managers, with a union representative present, at which she received negative feedback on her handling of the call, and she then "realized that this was actually a skill demo [test]" and that if she was not "able to come back and demonstrate proper call flow, then [she] would have been considered to have failed the training course." Id. Vol. II at 346.

Following the second call, Vann was given an hour with her union representative, who was also an experienced sales representative, to practice her interview technique, including her use of the call flow procedure that had been taught in the training program. This procedure involved going through a series of steps with customers in order to reassure them that their needs could be met, to identify those needs, and to make sales of the corresponding Southwestern Bell products. Vann then handled a third call, in which the customer began by asking for a specific person. That call was considered unusual, so Vann was given another call for testing purposes. During this final call, according to the Tulsa managers, Vann again failed to follow the proper call flow procedure and was frustrating the customer. Another representative was told to take over the call. Vann was then told that she had failed this test and would be retreated to her former position in the Wichita billing office.

Vann took a vacation day on July 3. Following the July 4 holiday, she took an approved disability leave from July 5 through September 1, 2002. On September 2, Vann left a voice mail message for her manager in Wichita, stating that she was resigning from Southwestern Bell.

Thereafter, on May 1, 2003, Vann filed suit against Southwestern Bell.[1] Her complaint alleged that she had been constructively discharged on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, and 42 U.S.C. § 1981, and that she had been unlawfully induced to accept the transfer to the Tulsa position as a result of misrepresentations concerning the conditions of employment in that position, in violation of Okla. Stat. Ann. tit. 40, § 167. Following discovery, Southwestern Bell filed a motion for summary judgment. In opposing summary judgment, Vann offered as statistical evidence of discrimination the fact that, in her training course, two out of three African-Americans failed while two out of seven Caucasians failed, and that, in the following class, two out of two African-Americans failed while two out of eight Caucasians failed. She also argued that Southwestern Bell had violated EEOC regulations by destroying handwritten notes that managers had taken during the live call demonstration tests.

Following a hearing, the district court granted Southwestern Bell's summary judgment motion. In regard to Vann's Title VII claim, the court concluded that Vann's resignation did not qualify as a constructive discharge, that

---

[1]The record indicates that Vann filed her complaint after she had failed to prevail in Southwestern Bell's internal grievance process, and after she had filed the required discrimination charge with the EEOC and received a Notice of Right to Sue.

Vann had failed to show that she had otherwise suffered an adverse employment action, and that even assuming that Vann could prove a prima facie case of race discrimination, Southwestern Bell had offered a legitimate nondiscriminatory reason for its decision to retreat Vann, and Vann had "failed to offer any evidence that would lead a reasonable person to find that the . . . reason offered by [Southwestern Bell] was nothing more than a pretext for discrimination."  Order at 16, Appellant's App. Vol. II at 630.  In so holding, the court ruled that Southwestern Bell's destruction of the notes did not violate EEOC regulations and that Vann's statistical evidence was not reliable.  In regard to Vann's state law claim, the court concluded that, although Vann assumed she would not have to pass the training program in Tulsa because of her previous training, this assumption "w[as] not based on [Southwestern Bell]'s false representations."  Order at 17, id. at 631.

Vann appeals the district court's grant of summary judgment in regard to her Title VII claim,[2] arguing that the district court erred (1) in concluding Vann had failed to establish an adverse employment action, (2) in concluding Vann had failed to establish constructive discharge, (3) in concluding Vann had failed to put

---

[2]Vann does not specify whether her appeal also encompasses her claim under 42 U.S.C. § 1981.  Because the elements of a race discrimination claim are the same whether the claim is brought under § 1981 or Title VII, Vann's § 1981 claim would fail for the same reasons set forth here.  Baca v. Sklar, 398 F.3d 1210, 1218 n.3 (10th Cir. 2005).

forth evidence that Southwestern Bell's proffered reasons for its actions were pretextual, (4) in concluding that Southwestern Bell's destruction of the notes had not violated EEOC regulations, and (5) in failing to credit Vann's statistical evidence. In her briefs, Vann did not renew her arguments in regard to her state law claim, and we therefore deem that claim waived. Douglas v. Dobbs, 419 F.3d 1097, 1100 n.2 (10th Cir. 2005) (noting appellant's failure to raise an issue in opening brief waives the issue), cert. denied, 126 S. Ct. 1147 (2006).

## DISCUSSION

"On appeal, we review the district court's grant of summary judgment *de novo*," applying the same legal standard, as set forth in Fed. R. Civ. P. 56(c). Orr v. City of Albuquerque, 417 F.3d 1144, 1148 (10th Cir. 2005). Accordingly, we will affirm "only if the record, considered in the light most favorable to the plaintiff, establishes no genuine issue of material fact," and the defendant is entitled to a judgment as a matter of law. Bastible v. Weyerhaeuser Co., 437 F.3d 999, 1004 (10th Cir. 2006) (internal quotation omitted).

As noted, Vann's appeal focuses on the district court's disposal of her Title VII race discrimination claim. Title VII prohibits an employer from "fail[ing] or refus[ing] to hire or . . . discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1).

Where, as here, a plaintiff employee relies on circumstantial, rather than direct, evidence to prove an employer has engaged in discrimination in violation of Title VII, we evaluate the claim following the burden shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1124 (10th Cir. 2005); Baca, 398 F.3d at 1216. Under McDonnell Douglas, the plaintiff bears the initial burden of "'establishing a prima facie case of racial discrimination.'" Amro v. Boeing Co., 232 F.3d 790, 796 (10th Cir. 2000) (quoting McDonnell Douglas Corp., 411 U.S. at 802). Once a prima facie case is established, the burden "then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action." Bryant, 432 F.3d at 1124-25. If the employer succeeds in doing so, the burden shifts back to the plaintiff to show that the employer's proffered reason is pretextual. Sanchez v. Denver Pub. Schs., 164 F.3d 527, 531 (10th Cir. 1998).

To make out a prima facie case of discrimination, a plaintiff must demonstrate "(1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees." Orr, 417 F.3d at 1149. Here, it is undisputed that Vann is a member of a protected class. However, as indicated above, the district court concluded that she failed to meet

the second requirement of the prima facie case because she had not suffered an adverse employment action.

We have stated that, "[b]ecause of the remedial nature of Title VII lawsuits, we broadly define adverse employment action." Id.; see Stinnett v. Safeway, Inc., 337 F.3d 1213, 1217 (10th Cir. 2003) (noting that the phrase "adverse employment action" is to be "liberally" construed). The language of Title VII indicates that such actions involve an employer's "fail[ure] or refus[al] to hire or . . . discharge [of]" an individual, as well as other actions that negatively impact an employee "with respect to his compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1); see Stinnett, 337 F.3d at 1217; Sanchez, 164 F.3d at 531; see also White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789, 795 (6th Cir. 2004) (en banc), cert. granted, 126 S. Ct. 797 (2005). While actions resulting in "monetary losses in the form of wages or benefits" are most easily recognized as adverse, our analysis is not limited to financial criteria. Stinnett, 337 F.3d at 1217 (internal quotation omitted). "Instead, we take a case-by-case approach, examining the unique factors relevant to the situation at hand." Id. (internal quotation omitted); see also Hillig v. Rumsfeld, 381 F.3d 1028, 1033 (10th Cir. 2004). However, "[a]ctions presenting nothing beyond a 'mere inconvenience or [an] [insignificant] alteration of responsibilities,' . . . do not

constitute adverse employment action." Stinnett, 337 F.3d at 1217 (quoting

Sanchez, 164 F.3d at 532).

Here, Vann argues that Southwestern Bell's requirement that she "retreat"

to her former position in Wichita after having transferred to Tulsa, qualifies as an

adverse employment action. In the alternative, she argues that she was

constructively discharged, which, as indicated, would also qualify as an adverse

employment action for purposes of Title VII.[3]

---

[3]We note that Vann's complaint failed to allege any adverse employment action as a basis for her Title VII claim other than constructive discharge. However, in her memo opposing summary judgment, she did raise the argument "that a compelled relocation at the employee's expense [was] a tangibly adverse job action," Appellant's App. Vol. II at 294, and she repeated this argument at the summary judgment hearing. In its reply memo, Southwestern Bell noted that even if Vann "successfully proves a discriminatory retreat," she would not be entitled to backpay damages following her resignation unless she could prove constructive discharge. Id. at 479 n.1 (citing Derr v. Gulf Oil Corp., 796 F.2d 340, 342 (10th Cir. 1986)). In its order granting summary judgment, the district court ruled that the retreat did "not qualify as an adverse employment action." Order at 15, id. at 629. Southwestern Bell has not suggested on appeal that the argument is waived, and has addressed the argument in its brief. In any case, because the issue of whether Vann's retreat qualifies as an adverse employment action was raised and ruled on below, we will address it. Shoels v. Klebold, 375 F.3d 1054, 1062 (10th Cir. 2004); Perington Wholesale, Inc. v. Burger King Corp., 631 F.2d 1369, 1373 (10th Cir. 1979). In her opening brief on appeal, Vann also refers to the district court's failure to address her "claim that she was denied a transfer to a desired position." Appellant's Op. Br. at 12. Vann does not cite to anyplace in the record where she raised this issue below, and we have been unable to locate any mention of it. We therefore deem that argument waived. Shoels, 375 F.3d at 1062.

**1.     Was Vann's Involuntary "Retreat" Back to Wichita an Adverse Employment Action?**

Vann points to our decision in <u>Schuler v. City of Boulder</u>, 189 F.3d 1304, 1310 (10th Cir. 1999), as setting forth the rule that any involuntary transfer may constitute an adverse employment action. However, our analysis in <u>Schuler</u> was in the context of a First Amendment retaliation claim. <u>See id.</u> We have explained that "repercussions that would not be actionable under Title VII" may form the basis for a First Amendment violation. <u>Baca</u>, 398 F.3d at 1220 (citing <u>Schuler</u>, 189 F.3d at 1310).

In the Title VII context, we have held that an involuntary transfer did not qualify as an adverse employment action where the transfer was "purely lateral," in that the employee's pay, benefits, and job responsibilities remained the same, and where the new position increased the employee's commute "from between five and seven minutes to between thirty and forty minutes." <u>Sanchez</u>, 164 F.3d at 532; <u>see also</u> <u>Wells v. Colo. Dep't of Transp.</u>, 325 F.3d 1205, 1213-14 (10th Cir. 2003) (holding plaintiff's reassignment, where "[h]er job classification and rate of pay remained the same, and her position was similar to those she had occupied in prior years," was not an adverse employment action). However, we have reversed summary judgment where an employee submitted evidence that her transfer "result[ed] in a significant change in responsibilities." <u>Stinnett</u>, 337

F.3d at 1217 (addressing transfer from a temporary data processing position back to permanent meat packing position).

Here, it is undisputed that the Wichita and Tulsa positions provided the same pay and benefits and that transfers between the two positions were lateral transfers. Moreover, Vann does not argue that the responsibilities of the Tulsa and Wichita positions were significantly different, even though the former involved high-end business sales and the latter involved billing queries. As Vann did not specifically seek the business sales position in Tulsa, but had sought to transfer to any open position in Tulsa, it is reasonable that the two lateral positions be compared based primarily on their different locations. In keeping with such logic, Vann focuses solely on the fact that her relocation from Tulsa to Wichita, 177 miles away, would have been at her own expense.

However, at the time of her retreat, Vann had been in Tulsa for only ten weeks, and her transfer was back to a position she had previously held, at a location where she had already lived for approximately five years. Moreover, the record indicates that Vann had been renting in Wichita and living in her mother's house in Tulsa, suggesting that her relocation would not require either selling or purchasing a house. While relocating to a city 177 miles away would no doubt entail some cost, that cost appears minimal under these circumstances, and Vann has not offered any evidence to the contrary.

Furthermore, as indicated above, Southwestern Bell's personnel policies had given notice that the relocation expenses of employees who initiate transfers for personal reasons would not be covered. Although Vann maintains that she had initially been unaware that she would be required to pass a new training course in Tulsa, the personnel policies provide that, even in the absence of a training requirement, any transferred employee could be retreated during the first six months if job performance was unsatisfactory. Under this framework, the possibility of incurring relocation expenses in the case of a retreat would seem to be a known risk of initiating a transfer for personal reasons. Taking all of these factors into account in the unique circumstances of this case, we conclude that Vann has failed to establish that her retreat qualifies as an adverse employment action for purposes of Title VII.

**2. Does Vann's Resignation Qualify as a Constructive Discharge?**

As indicated, Vann alternatively bases her Title VII prima facie case on the theory of constructive discharge. A plaintiff employee who wishes to establish that a resignation in effect constitutes a constructive discharge for purposes of a Title VII claim must show that the "employer [has] deliberately ma[d]e[] or allow[ed] the employee's working conditions to become so intolerable that the

employee has no other choice but to quit." <u>MacKenzie v. City & County of Denver</u>, 414 F.3d 1266, 1281 (10th Cir. 2005).

Vann argues that the Supreme Court's decision in <u>Pa. State Police v. Suders</u>, 542 U.S. 129 (2004), has changed this "no other choice" standard. In so arguing, Vann relies on the Court's articulation of the standard, in a case where the plaintiff claimed constructive termination based on hostile work environment, as requiring a claimant to "show that the abusive working environment became so intolerable that <u>her resignation qualified as a fitting response</u>." <u>Id.</u> at 134 (emphasis added). Later in <u>Suders</u>, the Court articulated the same standard as requiring a claimant to "show working conditions so intolerable that a reasonable person <u>would have felt compelled to resign</u>." <u>Id.</u> at 147 (emphasis added). Vann asserts that "[i]t should be self-evident that a reasonable person may feel 'compelled to resign' *even though there are other choices*." Appellant's Reply Br. at 7. We disagree. In our view, there is no meaningful distinction between the Court's language and ours. Our continued use of the "no other choice" standard in <u>MacKenzie</u>, quoted above, which followed <u>Suders</u>, supports this conclusion.[4]

_____

   [4]Vann also argues that <u>Suders</u> changed the requirement that a constructive discharge cannot be based on a discriminatory act alone, in the absence of "aggravating factors that make staying on the job intolerable." <u>James v. Sears, Roebuck & Co.</u>, 21 F.3d 989, 992 (10th Cir. 1994). We disagree. In any case,
(continued...)

Vann's constructive discharge argument again focuses on her forced relocation, at her own expense, back to Wichita, and on the allegation that she would have had to make this relocation in a single day. As Vann points out, a number of courts have recognized that an involuntary "transfer over a great distance can amount to a constructive discharge." Darnell v. Campbell County Fiscal Court, 731 F. Supp. 1309, 1313 (E.D. Ky. 1990), aff'd, 924 F.2d 1057 (6th Cir. 1991); see Christensen v. Equitable Life Assur. Soc. of U.S., 767 F.2d 340, 343 (7th Cir. 1985) (holding transfer from Indianapolis to Chicago was constructive discharge where new position might be eliminated if there was insufficient work and cost of living in new location was substantially higher). However, it is necessary to consider the question based on the facts of the particular case, using an objective standard. See Baca, 398 F.3d at 1216 ("When examining a constructive discharge claim, we disregard both the employee's subjective view of the workplace environment and the employer's subjective intentions regarding the employee.").

Here, as the district court concluded, Vann's assertion that she had only one day's notice before she would have had to relocate to Wichita is contradicted by evidence in the record that Vann "could have returned to Wichita during the

[4](...continued)
however, because Vann does not claim to have any direct evidence of a discriminatory act, this argument is inapposite.

-17-

period when she was on disability leave" and that she did not resign until after nearly two months of such leave.  Order at 15, Appellant's App. Vol. II at 629.

Otherwise, Vann rests her constructive discharge claim solely on the personal hardship that, she alleges, her return to Wichita would have caused her. While, as indicated above, an employee's subjective feelings about her working conditions are not relevant to an objective analysis, Vann argues that her personal circumstances constitute objective factors that the district court should have taken into account.  The few cases that have addressed the relevance of an employee's personal circumstances are conflicting.  Compare Piantanida v. Wyman Ctr., Inc., 927 F. Supp. 1226, 1243 (E.D. Mo. 1996) (recognizing that "an employee's personal circumstances may 'conceivably be relevant to a determination of constructive discharge'" (quoting Bradford v. Norfolk S. Corp., 54 F.3d 1412, 1417 (8th Cir. 1995))), aff'd 116 F.3d 340 (8th Cir. 1997), and Schwarz v. Nw. Iowa Cmty. Coll., 881 F. Supp. 1323, 1339 (N.D. Iowa 1995) (considering personal circumstances relevant where the plaintiff was arguing "that the College knew of and intentionally exploited her personal circumstances, her vision problems, to force her to quit"), with Cherchi v. Mobil Oil Corp., 693 F. Supp. 156, 163 (D.N.J. 1988) (holding that the employer "cannot be held responsible for the health problems of [the employee's] mother").  However, to the extent personal circumstances might make certain working conditions intolerable, it is

-18-

clear, given the requirement that an employer's actions must be deliberate in order to effect a constructive discharge, that the employer would have to be aware of those circumstances. See Piantanida, 927 F. Supp. at 1243 (requiring employee to "produce evidence that the employer was aware of those personal circumstances").

In this case, while Southwestern Bell knew that Vann had requested a transfer to Tulsa for personal reasons, Vann has not presented any evidence, or otherwise indicated, that Southwestern Bell knew her circumstances would prevent her from returning to Wichita if the Tulsa position did not work out. Moreover, the fact that Vann's employer provided an opportunity for her to transfer for personal reasons could as easily be viewed as contradicting the idea that it was trying to exploit her personal circumstances in order to force her to resign. We conclude that Vann has failed to establish that a reasonable person in her circumstances would have felt compelled to resign.

Vann has failed to raise a genuine issue of material fact in regard to her ability to establish a prima facie case. We therefore agree with the district court that Southwestern Bell is entitled to a judgment as a matter of law on that issue.

Accordingly, we need not address the remaining prongs of the <u>McDonnell Douglas</u> analysis.[5]

## CONCLUSION

For the foregoing reasons, the district court's entry of summary judgment in favor of the appellee is AFFIRMED.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge

---

[5]Because Vann's arguments in regard to Southwestern Bell's destruction of the managers' notes concerning her live calls and the district court's rejection of her statistical evidence relate only to the third prong of <u>McDonnell Douglas</u>, we also need not address those arguments.