FILED
United States Court of Appeals
Tenth Circuit

February 15, 2008

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

ALFRED ANDERSON,

       Plaintiff–Appellant,

v.

CLOVIS MUNICIPAL SCHOOLS;
RHONDA SEIDENWURM, in her
official capacity as Superintendent of
Schools and individually; ADAN
ESTRADA, in his official capacity
and individually,

       Defendants–Appellees.

No. 07-2160
(D.C. No. CIV-06-620 MCA/LCS)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, **BALDOCK**, and **LUCERO**, Circuit Judges.

Alfred Anderson appeals the district court's grant of summary judgment to

his former employer Clovis Municipal Schools ("School District"), School

District Superintendent Rhonda Seidenwurm, and his former principal Adan

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument.  See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel.  It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Estrada on his claims of racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and 42 U.S.C. § 1981. Anderson, an African-American special education teacher, bases his claims of discrimination on theories of disparate treatment, hostile work environment, and constructive discharge.[1] For substantially the same reasons as the district court, we **AFFIRM**.

**I**

**A**

From August 2000 to January 2006, Anderson was employed by the School District to teach at Bella Vista Elementary School in Clovis, New Mexico. The first three years of his tenure were apparently uneventful. In the fall of 2003, however, the School District hired Estrada as principal of Bella Vista and, succinctly stated, he and Anderson did not get along. Anderson alleges that Estrada treated him harshly compared to the non-African-American teachers at the school. He also claims that his teaching was subjected to greater scrutiny, that he was evaluated more frequently, and that Estrada was generally disrespectful in his interactions with him. As evidence of his prima facie case of racial discrimination, Anderson points to several examples of adverse actions that Estrada took against him.

---

[1] In addition to claims of racial discrimination, Anderson's complaint also included age-discrimination and breach-of-contract claims, which the district court dismissed. Anderson does not challenge the dismissal of those claims on appeal.

Anderson first claims that Estrada unlawfully placed him on a professional growth plan in September 2005. The plan at issue was reflected in a five-page document, which generally detailed: (1) areas in which Estrada thought Anderson needed to improve, (2) a proposed timeline for the noted improvements, (3) ways in which Anderson's progress would be measured, and (4) resources at Anderson's disposal to assist him in meeting the identified goals. Anderson immediately rejected the growth plan because, in his opinion, it was unnecessary as he was already in compliance with his duties as a special education teacher and there were no problems with his performance. He admitted at his deposition that he did not cooperate with Estrada during the growth plan process and that he did not make any extra effort to accomplish the goals set forth in the plan.

Second, Anderson claims that Estrada generally treated him harshly. Offering discrete examples of this type of treatment, Anderson argues that during a September 2003 meeting, Estrada became so angry with him that he yelled at Anderson and pointed a finger in his face, humiliating and degrading him in front of his colleagues. Anderson also claims that his laptop computer was stolen in January 2004, and that Estrada not only refused to replace it, but also implied that Anderson himself may have been involved in the theft. Finally, Anderson maintains that non-African-American teachers were provided with equipment that he was denied, and that he was required to teach a heavier case load than the other special education teacher at Bella Vista.

As his third argument that Estrada discriminated against him, Anderson points to a formal reprimand that he received around the same time that he was placed on the challenged growth plan. In October 2005, Estrada admonished Anderson for unruly student behavior in his classroom. According to Mandy Ratledge, a fellow teacher, she and a parent visited Anderson's classroom on October 7, 2005, and were greeted by a class that was "out of control with students yelling, running around the room, or playing on the floor." Ratledge reported the incident to Estrada, who, after meeting with Anderson, drafted a formal reprimand, dated October 12. It stated: "This communication shall serve as a written reprimand [for] your failure to manage a small classroom setting." To prevent the problem from recurring, the document instructed Anderson to keep his door open. Disagreeing with the action taken against him, Anderson responded to Estrada in writing, stating that his educational assistant was partly to blame for the "classroom disrespect and disciplining impairments."

Beginning with the 2005-06 school year, Anderson was denied participation in the after-school program through which he had earned extra income in the past. In his deposition, Estrada stated that Anderson's exclusion resulted from a district-wide effort to refrain from using any regular full-time teachers in the program in favor of non-school staff. He testified that during the 2005-06 school year full-time teachers were occasionally hired to work in the after-school program, but solely "on a substitute basis and really in emergency cases only."

For his part, Anderson disputes this statement, declaring that the real reason for his termination from the program was unlawful discrimination.[2]

Anderson does not accuse Estrada or anyone else at Bella Vista of making overtly discriminatory remarks. In fact, at his deposition, he conceded that he was unsure whether Estrada's attitude towards him was because of his race. He later testified by affidavit, however, that "Estrada fraternized with the white female teachers, while being harsh and abrasive in his interactions with [Anderson]" and that "[h]e would joke and laugh with the white teachers, while being stern with [Anderson]." Additionally, he alleges that in the fall of 2003, he complained to Jim McDaniel, Assistant Superintendent for Personnel, that he felt Estrada was treating him unfairly. McDaniel allegedly responded to Estrada by stating, "'I don't know if Estrada has a problem with your race, he's from Carlsbad, New Mexico.'"[3] According to Anderson, Estrada also once told him that he was glad to have Anderson at Bella Vista "as a minority, . . . but not as a teacher."

---

[2] In addition to the incidents discussed, Anderson also mentions three other adverse actions taken against him. He alleges that Estrada improperly: (1) removed him from his case-manager duties; (2) denied him the opportunity to mentor fellow teachers; and (3) subjected him to unnecessary observation by a third party.

[3] According to Anderson, Carlsbad historically segregated school students by race.

**B**

Following completion of discovery, the defendants jointly moved for summary judgment on all of Anderson's claims. They primarily based their disparate treatment arguments on the assertion that none of the aforementioned events rose to the level of an adverse employment action sufficient to trigger Title VII liability. For the most part, the district court agreed with the defendants. The court first concluded that Anderson had failed to adduce any direct evidence of discrimination, and that the success of his claims therefore depended on whether he had established indirect evidence of discrimination under the rubric laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Because the parties' disagreement was limited to whether Anderson had suffered adverse employment action based on the incidents described above, the court examined each of the allegedly adverse actions. It determined that Estrada's placement of Anderson on a professional growth plan and his otherwise harsh treatment did not constitute adverse employment actions as a matter of law. Similarly, the court concluded that the formal reprimand Anderson received was not an adverse action because it had no material impact on his employment status. As to the remaining claims of adverse actions, the district court simply assumed that they were adverse, and concluded that the defendants had offered legitimate, non-discriminatory rationales for each action taken. It then concluded that Anderson had failed to rebut the offered justification with any evidence that suggested the reasons given

were pretextual. Finally, the court dismissed Anderson's hostile work environment and constructive discharge claims for lack of jurisdiction, holding that he had failed to exhaust those claims by raising them before the EEOC. In the alternative, the court concluded that even if it had jurisdiction over those claims, they were without merit.

**II**

Before us, Anderson does not challenge the district court's finding that he failed to present any direct evidence of discrimination. He instead argues that the district court erred in concluding that Estrada's treatment, in particular placing him on a growth plan and issuing a written reprimand, did not constitute adverse employment actions. He also contends, more generally, that the district court's failure to find pretext in Estrada's justifications for his decisions was error. Finally, he challenges both the jurisdictional and evidentiary bases for the dismissal of his hostile work environment and constructive discharge claims.

**A**

"We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court." Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1218-19 (10th Cir. 2006) (quotation omitted). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(c). When reviewing the dismissal of a Title VII discrimination claim at the summary judgment stage, we follow the three-step framework set forth in McDonnell Douglas. A plaintiff must first "raise a genuine issue of material fact on each element of the prima facie case." MacKenzie v. City and County of Denver, 414 F.3d 1266, 1274 (10th Cir. 2005). Thereafter, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action. Id. Once the employer does so, the plaintiff must offer evidence sufficient to create a genuine issue of material fact as to whether the proffered reason was pretextual. Id. In a disparate treatment case, the plaintiff makes out his prima facie case by demonstrating "(1) that he is a member of a racial minority, (2) that he suffered an adverse employment action, and (3) that similarly situated employees were treated differently." Trujillo v. Univ. of Colo. Health Sciences Ctr., 157 F.3d 1211, 1215 (10th Cir. 1998) (citation omitted).

**B**

Anderson contends that the district court erred in rejecting his disparate treatment claims based on the growth plan, other harsh treatment, and written reprimand. He argues that the incidents alleged rise to the level of adverse employment actions sufficient to make out a prima facie case of discrimination. Relying primarily on Schuler v. City of Boulder, 189 F.3d 1304 (10th Cir. 1999), Anderson urges that the growth plan at issue in this case was sufficiently onerous to constitute an adverse employment action because it was both unnecessary and

specifically designed with unachievable goals.  He also claims that the formal reprimand rose to the level of an adverse employment action under the law of this circuit.

In Schuler, a former city employee claimed that the city retaliated against her for exercising free speech rights.  Id. at 1307.  She was not fired or suspended, but the city did remove some of her job duties, issue a written reprimand, and assign low scores on her performance evaluation.  Id. at 1306-07. We held these to be adverse employment actions, acknowledging that "[a]ctions short of an actual or constructive employment decision can in certain circumstances violate the First Amendment."  Id. at 1309-10 (quotation omitted). This general proposition, however, does not elevate Anderson's aversion to the growth plan to an actionable Title VII claim.

"While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action.  Otherwise, minor and even trivial employment actions . . . would form the basis of a discrimination suit."  MacKenzie, 414 F.3d at 1279 (quotation omitted). We do not mean to trivialize the subjective importance of the growth plan to Anderson.  But we must stress that even if Estrada's motives were discriminatory, which is not evident from the record before us, his implementation of the growth plan did not violate Title VII.  See Heno v. Sprint/United Mgmt. Co., 208 F.3d 847, 857 (10th Cir. 2000) (explaining that Title VII only proscribes

discriminatory conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, or adversely affects his or her status as an employee" (quotations omitted)).

> Only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action.

Haynes, 456 F.3d at 1222 (quotation omitted). The growth plan may have angered and embarrassed Anderson, but it did not affect his compensation or the terms, conditions, or privileges of his employment. To the contrary, it appears the plan was simply a tool to enhance Anderson's performance as a special education teacher. It was his refusal to accept the plan that appears to have been the problem. We therefore agree with the district court's rejection of the growth plan as a basis for a disparate treatment claim. See Haynes, 456 F.3d at 1224 (joining our sister circuits in holding that a professional improvement plan, standing alone, is not an adverse employment action).

We reach the same conclusion with respect to the October 12, 2005, formal reprimand. As we noted in Haynes, a written warning constitutes an adverse employment action "only if it effects a significant change in the plaintiff's employment status." 456 F.3d at 1224. Anderson's reprimand served as a warning that he faced consequences if he did not improve his classroom management skills. It did not serve as a demotion, alter his pay, or change his

responsibilities in any significant manner. As with the growth plan, he "was presented with clear goals to achieve [his] continued employment." Id. at 1225. We thus conclude that the reprimand fails to rise to the level of an adverse employment action.

Finally, Anderson contends that the general level of disrespect and harshness with which Estrada treated him should have been considered as a discriminatory adverse employment action. In support of this claim for relief, he points to numerous unpleasant interactions with his principal, including one in which Estrada allegedly threatened to hit him.[4] Without more, however, such a threat does not automatically equate to a Title VII violation. It is beyond dispute that Anderson enjoyed a less-than-friendly relationship with Estrada, but as we have noted, "not everything that makes an employee unhappy is an actionable adverse action." MacKenzie, 414 F.3d at 1279 (quotation omitted).

## C

The district court did assume that certain incidents raised by Anderson rose to the level of adverse employment actions. These included Estrada's decision to: (1) remove Anderson from the after-school program, (2) relieve him of his case-manager duties, (3) deny him the opportunity to mentor his fellow teachers, and (4) have an independent evaluator observe his teaching. As to these, however, the

---

[4] This accusation might warrant more discussion if it had any support in the record other than Anderson's deposition testimony that he believed Estrada might hit him simply because he was using an "aggressive . . . tone of voice."

-11-

court concluded that the defendants advanced legitimate, non-discriminatory reasons in explanation, and that Anderson failed to respond with evidence of pretext. On appeal, Anderson does not dispute the non-discriminatory reasons proffered by the defendants for the actions taken. He instead challenges the district court's conclusion regarding his purported evidence of pretext.

As primary support for his pretext argument, Anderson contends generally that he did not have performance issues before Estrada took over as principal. Nevertheless, even if true, that fact is not enough to show pretext. To defeat summary judgment, Anderson was required to show that following Estrada's arrival, there were no legitimate issues with his performance or that performance concerns were not the genuine reasons for the actions. He could have done this "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation [was] unworthy of credence." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).

The record does not support either of these scenarios. We are satisfied that teachers and administrators alike, as well as Anderson's educational assistant, felt he did not exercise adequate control over his classroom. His assistant, Lisa Dant, testified that the appellant was so disorganized that he sometimes misplaced his students' work. She stated that, on at least one occasion, Anderson assigned grades of zero as a consequence of having lost students' work. These problems

-12-

were reported to Estrada, who reacted by implementing the growth plan, reducing Anderson's responsibilities, and sending independent observers into his classroom. We agree with the district court that these actions were "legitimate responses on the part of an employer concerned with employee performance." Moreover, there is simply no evidence to support Anderson's theory that his performance issues were a pretext for unlawful discrimination. Defendants were therefore entitled to summary judgment on this claim. See EEOC v. PVNF, L.L.C., 487 F.3d 790, 800 n.5 (10th Cir. 2007) (recognizing that "if the court correctly concludes that the evidence of discrimination/pretext fails as a matter of law, summary judgment for the defendant is the proper result").

## D

This brings us to Anderson's claims of a hostile work environment and constructive discharge. The district court concluded that it lacked jurisdiction over these claims because Anderson had failed to raise them before the EEOC. Anderson does not specifically challenge this aspect of that decision on review. He instead focuses on his 42 U.S.C. § 1981 claims, and argues that these claims do not require exhaustion of administrative remedies. We are nonetheless "under a continuing obligation to examine both [our] own jurisdiction and the jurisdiction of the district court, whether or not raised by the parties." Local 514 Transp. Workers Union v. Keating, 358 F.3d 743, 749 n.6 (10th Cir. 2004).

"Exhaustion of administrative remedies is a 'jurisdictional prerequisite' to suit under Title VII." Jones v. Runyon, 91 F.3d 1398, 1399 (10th Cir. 1996). We have thus recognized that "[a] plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." MacKenzie, 414 F.3d at 1274 (citations omitted). Anderson filed a charge of racial discrimination with the EEOC, but did not specifically note "hostile work environment" and "constructive discharge" charges on the form.

Were we not required to "liberally construe charges filed with the EEOC in determining whether administrative remedies have been exhausted as to a particular claim," Jones v. United Parcel Serv., Inc., 502 F.3d 1176, 1186 (10th Cir. 2007), we might agree with the district court that this fact would prevent us from hearing these arguments. See MacKenzie, 414 F.3d at 1274 (liberally construing a plaintiff's charge of discrimination based on the ADA). However, reviewing the record before us, we conclude that these additional legal theories were, in factual substance, sufficiently alleged in the EEOC filing. Specifically, Anderson stated that "[b]eginning in February 2005 and continuing on a continuous basis I have been subjected to adverse terms and conditions unlike my peers." He also checked the box indicating that the discrimination was based on his race. Like the court in Jones, we think these two claims "can reasonably be expected to follow the charge of discrimination," see 502 F.3d at 1187 (quoting

-14-

MacKenzie, 414 F.3d at 1274), and thus conclude that Anderson's charge was sufficient to exhaust his administrative remedies and thereby confer jurisdiction. We thus turn to the merits of those claims.

**1**

To survive summary judgment on a claim alleging a racially hostile work environment, Anderson had to "show that a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." Sandoval v. City of Boulder, 388 F.3d 1312, 1327 (10th Cir. 2004). He had to show that he "was targeted for harassment because of [his] . . . race[] or national origin." Id. Because he has failed to produce any evidence tending to show that anyone at Bella Vista harbored racial animus towards him, Anderson has not made the required showing.

McDaniel's obscure remark that Estrada hailed from Carlsbad and Estrada's own comment that he was glad to have Anderson "as a minority, but not as a teacher," do not create a fact issue as to this claim when viewed in the totality of the circumstances. See PVNF, 487 F.3d at 799 (recognizing that the "totality of the circumstances test . . . is the touchstone of our analysis of hostile work environment claims" (quotations omitted)). A pervasively hostile work environment is not established "by demonstrating a few isolated incidents of

racial enmity or sporadic racial slurs. Instead, there must be a steady barrage of opprobrious racial comments." Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007) (quotation omitted). We examine the record from both an objective and subjective standpoint, "looking at all the circumstances from the perspective of a reasonable person in the plaintiff's position." Id. No reasonable fact-finder could conclude under this standard that Anderson was subjected to a hostile work environment. In fact, the relevant factors—frequency, severity, and whether the conduct unreasonably interfered with Anderson's work performance—are not available for examination because there is no evidence of discriminatory conduct. See Harsco Corp. v. Renner, 475 F.3d 1179, 1187 (10th Cir. 2007) (listing factors to be considered in determining whether environment is hostile or abusive). The district court therefore appropriately dismissed this claim on the merits.

**2**

We reach a substantially similar conclusion with respect to the alleged constructive discharge claim posited by Anderson because he has again failed to show actionable discrimination.

> Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign. Essentially, a plaintiff must show that [he] had no other choice but to quit. The conditions of employment must be objectively intolerable; the plaintiff's subjective views of the situation are irrelevant.

-16-

Sandoval, 388 F.3d at 1325 (quotation omitted).  The plaintiff carries a heavy burden on a constructive discharge claim.  It is not enough that his employer's conduct constituted adverse employment action or that it was discriminatory; a constructive discharge claim "requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but intolerable." PVNF, 487 F.3d at 805 (quotation omitted).  Anderson may have felt "ganged up on" and "alone oftentimes," but "given the objective standard, an employee's subjective feelings or beliefs are not relevant in a constructive discharge claim." Heno, 208 F.3d at 858.  Regrettable as Anderson's departure may have been, there is simply a dearth of evidence in the record before us that the working conditions at Bella Vista were such that a reasonable employee would have felt he had no other choice but to quit.  His constructive discharge claim was therefore properly dismissed.

## III

For the foregoing reasons, we conclude the district court correctly dismissed Anderson's Title VII claims.  Because his claim brought under 42 U.S.C. § 1981 was based on the same allegations of disparate treatment, that

claim was also properly dismissed.  <u>Etsitty v. Utah Transit Auth.</u>, 502 F.3d 1215, 1227-28 (10th Cir. 2007).  The judgment is **AFFIRMED**.


ENTERED FOR THE COURT



Carlos F. Lucero
Circuit Judge