**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 29, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ZEYNEP UNAL,

    Plaintiff - Appellant,

v.

LOS ALAMOS PUBLIC SCHOOLS; LOS
ALAMOS PUBLIC SCHOOLS SCHOOL
BOARD; EUGENE SCHMITT and
KATHRYN VANDENKIEBOOM, in their
individual capacities,

    Defendants - Appellees.

No. 15-2055
(D.C. No. 1:13-CV-00367-LAM-WPL)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **LUCERO**, and **McHUGH**, Circuit Judges.
_____

## I.   INTRODUCTION

    Zeynep Unal, an elementary school teacher in the Los Alamos Public School

District (LAPS), brought suit against LAPS, its Superintendent, and the principal of

the elementary school where she worked (collectively, Defendants) alleging various

claims of national-origin discrimination and retaliation, in violation of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 1981, the Equal Protection Clause of the

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value. Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Fourteenth Amendment to the U.S. Constitution, and the New Mexico Human Rights Act. The district court granted summary judgment in favor of Defendants on all claims. On appeal, Ms. Unal argues she presented sufficient evidence at summary judgment to send her hostile-work-environment and retaliation claims to a jury. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse in part and affirm in part.

## II.    BACKGROUND

### A.  Factual History

Because this matter comes to us on appeal from a grant of summary judgment for Defendants, we present the facts in the light most favorable to the nonmoving party, Ms. Unal. *Eisenhour v. Weber Cty.*, 744 F.3d 1220, 1226 (10th Cir. 2014). Ms. Unal, a Turkish-born Muslim woman who speaks with a distinct Turkish accent, has worked for LAPS as an elementary teacher in the district's Gifted and Talented Education (GATE) program since 2004. In 2006, she began working at Aspen Elementary School. In 2008, LAPS hired Katheryn Vandenkieboom as the principal of Aspen Elementary School. As principal, Ms. Vandenkieboom was Ms. Unal's supervisor from 2008 to 2012.

Ms. Unal alleges that during her time working under Ms. Vandenkieboom's supervision, the school had a culture of racial and ethnic insensitivity and Ms. Vandenkieboom made, encouraged, or acquiesced in various hostile comments. Some of these insensitive comments were directed at Ms. Unal. For example, while eating lunch in the faculty lounge one day, Ms. Vandenkieboom and others began discussing an American movie. Ms. Vandenkieboom, in front of the staff, told

2

Ms. Unal "You wouldn't know about this. You are not from here." On another occasion during an after-school Christmas concert in which Ms. Unal's own child was participating, Ms. Vandenkieboom thanked various teachers for their attendance at the concert but approached Ms. Unal and asked, "what are you doing here?" Ms. Vandenkieboom would also condescendingly correct Ms. Unal's pronunciation in front of staff. And another staff member once called Ms. Unal "a turkey from Turkey," although the staff member later apologized.

Beyond the comments made directly to Ms. Unal, Ms. Vandenkieboom and her staff made insensitive remarks about other nationalities. Ms. Vandenkieboom repeatedly referred to a Vietnamese family as the "little people," and staff members joked openly about an Asian family's surname, Fu, equating it with a crude insult, "F.U." The school's office staff would also make announcements over the school's intercom system in feigned foreign accents and laugh about it.[1] Ms. Unal was not the only faculty member to notice this insensitive conduct. On January 7, 2012, Sherry Sanchez, the school's speech therapist, wrote an email to Ms. Unal summarizing discriminatory conduct she had observed at the school.

---

[1]Ms. Unal also relies on evidence showing Ms. Vandenkieboom told a group of staff members that she wished certain Hispanic and Native American students who left an offensive message on the school's voicemail "would all die" and that they "don't deserve the dirt they walk on." But Ms. Unal failed to demonstrate that, in making these comments, Ms. Vandenkieboom was motivated by national-origin or racial animus toward the students, rather than offense based on the content of their message. In addition, there was no evidence presented that Ms. Unal was aware of these comments during the time she was allegedly subject to a hostile work environment. We therefore do not consider them.

Ms. Unal, who was the only foreign-born teacher at Aspen Elementary, also alleges she was subjected to disparate treatment because of her national origin. For instance, prior to Ms. Vandenkieboom's arrival, Ms. Unal was considered a good teacher and regularly received positive reviews; however, once Ms. Vandenkieboom became principal, Ms. Unal's coworkers observed that this changed. They noticed that Ms. Vandenkieboom treated Ms. Unal as if she "didn't really know what she was doing." Ms. Unal also observed that Ms. Vandenkieboom would not make eye contact with her. On one occasion, Ms. Unal informed Ms. Vandenkieboom it was against state regulations to require Ms. Unal to grade the GATE students and to insist she also teach regular education classes. Ms. Vandenkieboom did not believe Ms. Unal until a LAPS administrator confirmed that Ms. Vandenkieboom's requests were contrary to state regulations.

Ms. Vandenkieboom also excluded Ms. Unal from certain work-related communications in which Ms. Unal had previously participated. For example, early in Ms. Vandenkieboom's tenure as principal of Aspen Elementary, she sent an email to all the teachers except Ms. Unal requesting feedback on the GATE program and also held a GATE meeting to which she did not invite Ms. Unal. But Ms. Vandenkieboom did not exclude other teachers from communications regarding their specialized programs. Ms. Vandenkieboom also established disparate expectations for faculty attendance at meetings scheduled to discuss students who had Individualized Education Plans (IEP). Although Ms. Vandenkieboom routinely

4

excused teachers from attending meetings to discuss Ms. Unal's IEP students, she made no such exceptions for attendance at other teachers' IEP meetings.

Ms. Vandenkieboom was also uncharacteristically slow in responding to Ms. Unal's professional needs. During the 2010–2011 school year, for example, Ms. Vandenkieboom assigned Ms. Unal a class size of over fifty students—nearly double the size permitted under state law. Although Ms. Unal "accepted" the large class size, she anticipated, per school policy, that she would receive a permanent instructional assistant. Instead, Ms. Unal received "sporadic[]" support from instructional assistants assigned to other teachers at the school.

In contrast, when another teacher received an influx of students later that same school year, Ms. Vandenkieboom resolved her instructional-assistant needs within one week. Even after the school's Coordinator for Student Services informed Ms. Vandenkieboom of the need to assign Ms. Unal an instructional assistant, several months passed before Ms. Vandenkieboom complied. After Ms. Unal was finally assigned her own instructional assistant, the assistant praised Ms. Unal's ability to give each student individualized attention, despite having to manage such a large workload.

Ms. Vandenkieboom also solicited performance information and negative feedback about Ms. Unal, but did not seek criticism about other teachers. Specifically, Ms. Vandenkieboom questioned the school's speech therapist, Ms. Sanchez, about Ms. Unal's performance, but did not question Ms. Sanchez about the performance of any other teachers. According to Ms. Sanchez, Ms.

Vandenkieboom stated, "I'm going to get [Ms. Unal]." Ms. Vandenkieboom likewise solicited negative feedback about Ms. Unal from a substitute teacher. Yet she did not ask substitutes about the performance of other teachers.[2] Although the substitute teacher gave no negative feedback, on a separate occasion, three teachers who were considered close friends of Ms. Vandenkieboom complained that Ms. Unal failed to provide them with GATE student progress reports, even though no policy existed requiring GATE teachers to provide non-GATE teachers with such information. Based on this negative feedback, Ms. Vandenkieboom verbally counseled Ms. Unal.

Shortly thereafter, Ms. Unal reported what she perceived as discriminatory conduct. In the spring of the 2010–2011 school year, Ms. Unal wrote a letter to the Assistant Superintendent, Paula Dean. In the letter, Ms. Unal expressed her belief that Ms. Vandenkieboom was biased against her and that Ms. Vandenkieboom seemed to have a problem with Ms. Unal's culturally different background. Four days

---

[2] Ms. Unal also points to a letter from her instructional assistant indicating that Ms. Vandenkieboom asked the instructional assistant how Ms. Unal was treating her, "in a manner that implied [the assistant] should say negative things to curry favor with" Ms. Vandenkieboom. Defendants contend the letter is inadmissible hearsay and therefore insufficient to defeat summary judgment. Although the nonmoving party at summary judgment need not "produce evidence in a form that would be admissible at trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, she must nonetheless demonstrate that the content of the evidence could be presented in an admissible form at trial, *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006); 11 JAMES WM. MOORE ET AL., *Moore's Federal Practice - Civil* § 56.91 (3d ed. 2015) ("The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form."). Here, Ms. Unal has failed to do so. We therefore do not consider the hearsay statements of the instructional assistant contained in the letter.

after Ms. Unal sent this letter, Ms. Vandenkieboom issued Ms. Unal three disciplinary letters, which covered the same topics she had discussed during the earlier verbal counseling. Ms. Unal then submitted a formal grievance to the district contesting the disciplinary letters. In response, LAPS administration held a meeting involving Ms. Unal, the Human Resource Coordinator, Ms. Vandenkieboom, and Ms. Unal's union representative. Ms. Unal requested that the disciplinary letters be removed from her file and that she be assigned a new supervisor. During the meeting, the LAPS representatives indicated that Ms. Unal's demands would be met.

Just days later, in the middle of class, Ms. Vandenkieboom, the Human Resource Coordinator, and Assistant Superintendent Dean entered Ms. Unal's class unannounced, pulled Ms. Unal out of the classroom, and told her that Ms. Vandenkieboom would remain her supervisor and that the school was moving her class from the building to an outside portable classroom, effective immediately. This incident happened within a month of the end of the school year. Neither Ms. Vandenkieboom nor LAPS provided an explanation for the move.

During this same timeframe, Ms. Unal began suffering from panic attacks. Her health continued to deteriorate and in July 2011, she had a panic attack shortly after exercising that caused her to faint, hit her head, and suffer a concussion. Ms. Unal sought medical attention, and the doctor cited the "extraordinary stress from" work, her mother's poor health, and marital problems as potential causes of the panic attacks. The doctor prescribed her antidepressants. Ms. Unal then applied for and received medical leave, which she remained on for the duration of the 2011–2012

7

school year. On January 13, 2012, while she was on leave, Ms. Unal filed a charge of discrimination against Defendants with the Equal Employment Opportunity Commission (EEOC). The EEOC eventually granted Ms. Unal a right-to-sue letter.

Several months later, in accordance with Ms. Unal's teaching contract, LAPS sent her a notice of intent to rehire for the 2012–2013 school year. Per the terms of the notice, Ms. Unal was required to return the signed notice within fifteen days to renew her contract. The notice was dated May 7, 2012. Ms. Unal received the notice on May 19, 2012, and hand delivered the signed notice on May 23, 2012. Despite Ms. Unal having returned the notice within fifteen days of receiving it, LAPS attorneys did not initially accept the notice, thereby effectively terminating Ms. Unal. After Ms. Unal's attorneys became involved, however, LAPS conceded that Ms. Unal's response was timely and rescinded the termination. Ms. Unal entered a contract with LAPS to teach at a different elementary school for the 2012–2013 school year.

### B.  Procedural History

Ms. Unal filed this lawsuit against LAPS, Superintendent Eugene Schmidt, and Ms. Vandenkieboom alleging, among other things, hostile work environment and retaliation in violation of Title VII, 42 U.S.C. § 1981, the Equal Protection Clause to Fourteenth Amendment, and the New Mexico Human Rights Act. Ms. Unal alleged three separate instances of retaliation: (1) Ms. Vandenkieboom's issuance of three disciplinary letters shortly after Ms. Unal sent a letter to the district complaining of discrimination; (2) Ms. Vandenkieboom and Assistant Superintendent Dean's

8

conduct in entering her classroom unannounced, reneging their commitment to assign Ms. Unal a new supervisor, and ordering her class to relocate to a portable trailer shortly after she filed her formal grievance; and (3) the district's initial decision to terminate Ms. Unal for allegedly failing to timely respond to the notice of intent to rehire. Defendants moved for summary judgment on all counts, and the district court granted the motion in whole.

Regarding the hostile-work-environment claim, the district court reasoned the evidence failed to show Ms. Vandenkieboom's and her staff's conduct was sufficiently severe or pervasive to support a claim for hostile work environment. As to the retaliation claims, the district court rejected each on separate grounds. It concluded (1) Ms. Unal failed to demonstrate Ms. Vandenkieboom knew of Ms. Unal's letter to the district at the time she issued the disciplinary letters, (2) the relocation of Ms. Unal's class to the portable classroom outside the building did not constitute a materially adverse employment action, and (3) no causal connection existed between Ms. Unal's EEOC action and LAPS's initial decision to terminate her. This appeal followed.

## III.    DISCUSSION

We review de novo the district court's grant of summary judgment on Ms. Unal's hostile-work-environment and retaliation claims, applying the same standard as the district court. *Bertsch v. Overstock.com*, 684 F.3d 1023, 1027 (10th Cir. 2012). We view the evidence and all reasonable inferences to be drawn from it in the light most favorable to the nonmoving party. *Id.* Viewing the evidence this way,

9

summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way, and an issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lounds v. Lincare, Inc.*, --- F.3d. ---, No. 14-3158, 2015 WL 9299074, at *9 (10th Cir. 2015) (brackets and internal quotation marks omitted). Because of their fact-intensive nature, employment-discrimination claims are not well suited for summary judgment and should "go to the jury so long as the evidence is sufficient to allow the jury to disbelieve the employer's explanation for the alleged misconduct." *Id.* (brackets and internal quotation marks omitted). Applying this standard to Ms. Unal's claims of hostile work environment and retaliation, we conclude the district court erred in granting summary judgment on Ms. Unal's hostile-work-environment claim, but we affirm summary judgment in favor of Defendants on her retaliation claims.

## A. Hostile Work Environment

Under Title VII of the Civil Rights Act of 1964, an employer may not "discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer violates Title VII when it allows "a hostile work environment based on race or national origin discrimination." *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012) (internal

quotation marks omitted). Title VII is not a "general civility code," *id.*; therefore, to avoid summary judgment on a hostile work environment claim, a plaintiff "must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 958 (internal quotation marks omitted).

To carry her prima facie burden under the hostile-work-environment framework, Ms. Unal must show "(1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on [national origin]; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of [her] employment and created an abusive working environment." *Lounds*, 2015 WL 9299074, at *11 (brackets and internal quotation marks omitted).

The parties here agree that Ms. Unal is a member of a protected group based on her national origin and that she was subject to some unwelcome harassment. The parties dispute, however, whether the harassment was based on Ms. Unal's national origin and whether it was sufficiently severe or pervasive to demonstrate a hostile work environment. Our analysis therefore proceeds by assessing whether Ms. Unal's evidence raises a genuine dispute as to these two elements of a hostile-work-environment claim. We conclude that it does.

11

## 1. National-Origin-Based Harassment

To survive summary judgment on a claim of national-origin-based hostile work environment, a plaintiff must show harassment stemming from animus toward her national origin. *Hernandez*, 684 F.3d at 960. Although evidence of animus directed at a plaintiff's particular nationality provides the strongest evidence of a hostile work environment, "evidence of a general work atmosphere, including evidence of harassment of other [nationalities], may be considered in evaluating a claim, as long as [plaintiff] presents evidence that [s]he knew about the offending behavior." *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1146 (10th Cir. 2008) (internal quotation marks omitted); *see also Hernandez*, 684 F.3d at 959 ("[D]erogatory comments need not be directed at or intended to be received by the victim to be evidence of a hostile work environment."). Moreover, "facially neutral abusive conduct can support a finding of [national-origin-based] animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly . . . discriminatory conduct." *Hernandez*, 684 F.3d at 960 (brackets and internal quotation marks omitted). Thus, courts evaluating a hostile-work-environment claim must avoid viewing individual instances of hostility in isolation but instead must look to the "totality of the circumstances." *Id.* at 959 (internal quotation marks omitted); *see also McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 925 (10th Cir. 2001) ("[W]hen we examine the context of this Title VII claim, we look at both specific hostility targeting Plaintiffs as well as the general work atmosphere.").

In this case, Ms. Unal presents three categories of evidence that she contends create a genuine issue of national-origin-based harassment: (1) comments or conduct that were overtly based on her nationality, (2) hostile comments made about people of other nationalities, and (3) facially-neutral conduct demonstrating she was treated differently than her U.S.-born peers. As to the first category, Ms. Unal produced evidence of three instances when Ms. Vandenkieboom and other staff members made derogatory comments to Ms. Unal based on her nationality. On one occasion, Ms. Vandenkieboom questioned why Ms. Unal would attend a school Christmas concert, but thanked other teachers for their attendance, and on a separate occasion Ms. Vandenkieboom excluded Ms. Unal from a conversation about an American movie because Ms. Unal is "not from here." Additionally, a different staff member once called Ms. Unal a "turkey from Turkey."

The district court concluded the only direct comment about Ms. Unal's nationality was the "turkey from Turkey" comment. But the district court failed to consider the reasonable inference that Ms. Vandenkieboom's comments, when taken in context, were intended to emphasize negatively Ms. Unal's status as a foreigner.[3] And although Ms. Vandenkieboom's comment at the Christmas concert could be interpreted as demonstrating animus toward Ms. Unal based on her Muslim faith,

---

[3] Excluding Ms. Unal from the discussion about the movie would do little, standing alone, to advance her hostile work environment claim. But when combined with the other two incidents, it provides some evidence that she was targeted based on her national origin.

13

Turkey's status as a predominantly Muslim country[4] effectively intertwines Ms. Unal's religion and nationality. *See Hassan v. City of New York*, 804 F.3d 277, 303 (3d Cir. 2015) ("The history of religious discrimination in the United States is intertwined with that based on other protected characteristics, including national origin and race."). Thus, a jury could reasonably infer from this comment that Ms. Vandenkieboom harbored animus toward Ms. Unal because of her national origin.

Second, Ms. Unal's evidence of harassing comments directed at other nationalities will support an inference of a national-origin-based hostile work environment if Ms. Unal was present when they were made or otherwise became aware of them "during the time that she was allegedly subject to a hostile work environment." *Hirase-Doi v. U.S. W. Commc'ns, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995); *superseded on other grounds by Faragher v. City of Boca Raton,* 524 U.S. 775 (1998); *accord Tademy*, 614 F.3d at 1146. Ms. Unal knew of the following comments or conduct directed at other nationalities: Ms. Vandenkieboom's use of the term "little people" to refer to a Vietnamese family; staff members' use of feigned foreign accents to make school-wide announcements while other staff members laughed at this conduct; and an instance where some staff members mocked an Asian family based on their surname Fu. There is no evidence, however, that Ms. Unal was aware during the relevant time period that staff members had joked that the "valley people"

---

[4] *See Middle East: Turkey*, CIA World Factbook (Dec. 10, 2015), https://www.cia.gov/library/publications/the-world-factbook/geos/tu.html (listing Turkey's religious make-up as 99.8% Muslim, 0.2% other).

14

would steal from them during a power outage or that staff members had made other racially discriminatory comments about Hispanic and Native American students.[5] Therefore, we may not consider these comments in assessing the environment at Aspen Elementary. Notwithstanding this limitation, we are convinced that the comments directed at other nationalities of which Ms. Unal was aware support an inference that the administration at Aspen Elementary maintained a culture of animus towards foreign-born individuals.

Finally, Ms. Unal relies on several instances of facially neutral conduct that she argues support an inference of hostility based on her national origin. In assessing the totality of the evidence supporting a hostile-work-environment claim, "what is important . . . is the *environment*, and [facially] neutral harassment makes up an important part of the relevant work environment." *Hernandez*, 684 F.3d at 960 (internal quotation marks omitted). Therefore, "when a plaintiff introduces evidence of both [facially discriminatory] and [facially] neutral harassment, and when a jury, viewing the evidence in context, reasonably could view all of the allegedly harassing conduct as the product of [national-origin] hostility, then it is for the fact finder to decide whether such an inference should be drawn." *Id.* (ellipsis and internal quotation marks omitted).

---

[5] For instance, Ms. Unal relies on Ms. Vandenkieboom's derogatory comments about Hispanic students and Ms. Vandenkieboom's decision to send the police to the homes of Hispanic families who had not returned a waiver form. Although Ms. Unal learned about these comments prior to the filing of her EEOC complaint, she did not hear any of the comments directly, and she has not pointed to anything in the record demonstrating that she was aware of these comments during the time period in which she was allegedly subject to a hostile work environment.

In this case, Ms. Unal presented evidence of various facially neutral incidents that a jury could view as products of national-origin hostility. The evidence shows that Ms. Vandenkieboom (1) solicited negative feedback about Ms. Unal from a substitute teacher, but did not do so with respect to other teachers; (2) discounted Ms. Unal's knowledge and expertise concerning the GATE program, as evidenced by her failure to include Ms. Unal in GATE communications; (3) excused other teachers from attending Ms. Unal's IEP meetings but made no such exception for attendance at other teachers' IEP meetings; (4) let several months pass before assigning Ms. Unal her own instructional assistant but immediately assigned an instructional assistant to a U.S.-born teacher who accepted a large class size; (5) regularly corrected Ms. Unal's pronunciation in front of other staff members; and (6) entered Ms. Unal's classroom unannounced and, without explanation, required her to move her class to a portable classroom.

These seemingly neutral incidents "cannot simply be discarded" because they were not discriminatory on their face. *Id.* (internal quotation marks omitted). Instead, we must view them in relation to the totality of the circumstances because they "must be weighed on the side of reasonable inferences." *Id.* (internal quotation marks omitted). The relevant circumstances here include Ms. Unal's status as the school's only foreign-born teacher, Ms. Vandenkieboom's disparate treatment of other teachers, and evidence showing a culture of animus towards individuals of different national origin. Viewing all the evidence together, in context, a reasonable jury could conclude that these facially neutral incidents were products of a larger environment

16

of hostility toward foreign-born individuals like Ms. Unal. We therefore conclude that Ms. Unal presented sufficient evidence at summary judgment from which a reasonable jury could conclude the harassment she experienced was based on her national origin.

## 2. Severity or Pervasiveness

Next, we consider whether the harassment was sufficiently severe or pervasive to have altered a term, condition, or privilege of Ms. Unal's employment. "'There is not, and by its nature cannot be, a mathematically precise test'" for satisfying this element of a hostile-work-environment claim. *Hernandez*, 684 F.3d at 957 (brackets omitted) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)). Instead, we look to the totality of the circumstances and consider various factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Lounds*, 2015 WL 9299074, at *11 (internal quotation marks omitted). In demonstrating these factors, the plaintiff "must show more than a few isolated incidents" of enmity based on her national origin. *Id.* (internal quotation marks omitted). Instead, the plaintiff must demonstrate she was subject to a "steady barrage of opprobrious" conduct directed at her because of her national origin. *Id.* (internal quotation marks omitted). Moreover, a plaintiff must prove not only that she subjectively "deem[ed] the work environment hostile," but also that the environment was objectively hostile as viewed by "a

17

reasonable employee under the same or similar circumstances." *Id.* (internal quotation marks omitted).

"[P]ervasiveness and severity are independent and equal grounds upon which a plaintiff may establish this element of a hostile environment claim." *Tademy*, 614 F.3d at 1144 (internal quotation marks omitted). Indeed, as logic would suggest, the two are often "inversely related" such that "a sufficiently severe episode may occur as rarely as once, while a relentless pattern of lesser harassment that extends over a long period of time" may also be sufficient to demonstrate a hostile work environment. *Id.* (ellipsis and internal quotation marks omitted). Because of its inherently fact-intensive nature "the severity and pervasiveness evaluation is particularly unsuited for summary judgment." *Lounds*, 2015 WL 9299074, at *11.

Here, Ms. Unal points to no single incident that was sufficiently severe to satisfy this element of a hostile work environment on its own. Instead, she contends that when looking to the cumulative effect of all relevant conduct—including the overtly hostile conduct directed at her, the conduct directed at other nationalities, and the facially neutral conduct—a reasonable jury could conclude she was subject to a pervasive environment of hostility because of her status as a foreigner. Specifically, Ms. Unal was the direct recipient of three harassing comments based on her national origin; heard or became aware of insensitive comments made about Asian students and people who speak with accents; and experienced numerous incidents of disparate treatment that could reasonably be viewed as intended to isolate, disregard, or undermine her because of her national origin.

18

Although we acknowledge the wide timespan during which this conduct took place—from the fall of 2008 when Ms. Vandenkieboom became principal of Aspen Elementary until the summer of 2011 when Ms. Unal took a leave of absence—we are persuaded that the harassing conduct occurred with enough frequency that a reasonable jury could conclude Ms. Unal experienced a pervasively hostile work environment. Moreover, a reasonable jury could find this conduct was both objectively and subjectively hostile. The harassing conduct remained persistent throughout the time Ms. Unal worked under Ms. Vandenkieboom's supervision such that a reasonable person in Ms. Unal's position could deem it hostile. The conduct also motivated Ms. Unal to file a formal grievance, request a new supervisor, take a leave of absence, and relocate to a new school. Ms. Unal's work environment was also at least one contributing factor in the onset of her panic attacks. When viewed in the light most favorable to Ms. Unal, this evidence demonstrates she subjectively felt a "steady barrage" of harassing conduct.

Although this is a close case, viewing Ms. Unal's allegations in context and considering the totality of the circumstances, we conclude her hostile work environment claim should have survived summary judgment. The district court deemed the "turkey from Turkey" comment the only overtly national-origin-based comment made directly to Ms. Unal. But as explained above, we are persuaded Ms. Unal presented evidence of at least two other comments that could reasonably be viewed as demonstrating direct hostility toward her based on her national origin. These are Ms. Vandenkieboom's inquiry as to why Ms. Unal was at the Christmas

19

concert and her comment that Ms. Unal is "not from here" and would therefore not understand an American movie.

The district court also concluded the remaining culturally insensitive comments were only obscurely racial and were not directed at Ms. Unal. Although we agree with the district court that many of these derogatory comments were directed at other individuals and nationalities, as we explained above, such evidence "may be considered in evaluating a [hostile-work-environment] claim." *Tademy*, 614 F.3d at 1146. Ms. Unal offered evidence from which a reasonable jury could find that Ms. Vandenkieboom participated in and encouraged xenophobia in the workplace.

Finally, the district court paid little heed to Ms. Unal's evidence of facially neutral conduct, disregarding this evidence because Ms. Unal did not demonstrate sufficient opposition to the conduct. But Ms. Unal presented evidence showing she opposed Ms. Vandenkieboom's conduct by writing a letter to district administrators and filing a formal grievance. Moreover, when viewed in the context of the other evidence of hostility, a reasonable inference drawn from Ms. Vandenkieboom's facially neutral but disparate treatment of Ms. Unal is that Ms. Vandenkieboom was motivated by national-origin-based animus toward Ms. Unal.

Unlike the district court, we are not persuaded that our decision in *Anderson v. Clovis Mun. Sch.*, 265 F. App'x 699 (10th Cir. 2008), dictates a different result. Not only is *Anderson* nonprecedential, 10th. Cir. R. 32.1, it is distinguishable. In that case, we affirmed summary judgment in favor of the defendants on a school teacher's hostile-work-environment claim. *Id.* at 707. Although the plaintiff in *Anderson*, a

20

minority school teacher, presented some evidence similar to that which Ms. Unal has presented here—namely, that his principal subjected him to greater scrutiny, degraded him in front of other teachers, and required him to teach a heavier load than other teachers—the plaintiff in that case "failed to produce any evidence tending to show that anyone at [the school] harbored racial animus toward him." *Id.* In contrast, Ms. Unal has presented evidence of comments Ms. Vandenkieboom and a staff member made demonstrating animus toward Ms. Unal based on her national origin. Ms. Unal has also produced evidence showing Aspen Elementary's pervasive culture of hostility and insensitivity towards foreign-born individuals generally. Therefore, unlike the plaintiff in *Anderson*, Ms. Unal has produced evidence supporting a reasonable inference that Ms. Vandenkieboom and others harbored animus based on Ms. Unal's national origin.

In sum, a reasonably jury could conclude Ms. Unal was subject to unwelcome harassment based on her national origin and the pervasiveness of the harassment altered a term, condition, or privilege of her employment, thus creating an abusive work environment. Consequently, we reverse the district court's grant of summary judgment in favor of the Defendants on this issue.

### *B. Retaliation*

We turn now to Ms. Unal's retaliation claims, which she raises under Title VII, 42 U.S.C. § 2000e-3(a); 42 U.S.C. § 1981; the Equal Protection Clause of the Fourteenth Amendment; and the New Mexico Human Rights Act, N.M. Stat. Ann. § 28-1-7. But the Equal Protection Clause is not generally a suitable vehicle for raising

21

a retaliation claim. *See Teigen v. Renfrow*, 511 F.3d 1072, 1086 (10th Cir. 2007) ("The mere illegality of a retaliatory action under a separate body of law does not make the resulting classification so illegitimate, irrational, or arbitrary as to violate the Equal Protection Clause.") We therefore assess Ms. Unal's retaliation claim under the three statutory provisions only.

Under each of these provisions, a plaintiff may prove retaliation either through direct evidence "or by adhering to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Davis v. Unified Sch. Dist. 500*, 750 F.3d 1168, 1170 (10th Cir. 2014); *see also Juneau v. Intel Corp.*, 127 P.3d 548, 551 (N.M. 2006) ("For a claim of unlawful discrimination [including retaliation], this Court has used the methodology from *McDonnell Douglas Corp. v. Green*."). Under this framework, a plaintiff must first make a prima facie showing of retaliation by proving, "(1) [s]he engaged in protected activity; (2) [s]he suffered an adverse employment action; and (3) there is a causal connection between [her] protected activity and the adverse employment action." *Davis*, 750 F.3d at 1170; *see also Charles v. Regents of New Mexico State Univ.*, 256 P.3d 29, 33 (N.M. 2010) ("In order to establish a claim of retaliation under the NMHRA, a plaintiff must demonstrate that (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between these two events." (internal quotation marks omitted)).

If the plaintiff satisfies this burden, it is then the defendant's responsibility to "come forward with a legitimate, non-retaliatory rationale for the adverse

22

employment action." *Lounds v. Lincare*, --- F.3d ---, 2015 WL 9299074, at *23 (ellipses and internal quotation marks omitted). If the defendant does so, the burden then shifts back to the plaintiff to "show that the defendant's proffered rationale is pretextual." *Id.* "An employee may demonstrate pretext by showing the employer's proffered reason was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004).

Applying this framework to Ms. Unal's three claims of retaliation, we conclude the district court properly granted summary judgment on each claim.

## 1. Disciplinary Letters

Ms. Unal claims, first, that the three disciplinary letters Ms. Vandenkieboom issued in the spring of 2011 were submitted in retaliation for Ms. Unal's letter to LAPS administration complaining of discrimination. The district court deemed Ms. Unal's letter to LAPS protected activity and Ms. Vandenkieboom's disciplinary letters an adverse employment action. But the district court granted summary judgment on this claim because Ms. Unal failed to show a causal connection between the protected activity and the disciplinary action. Specifically, the district court found Ms. Unal had failed to come forward with any evidence that Ms. Vandenkieboom was aware of the letter to LAPS when she issued the disciplinary letters. On appeal, Defendants do not dispute that Ms. Unal has satisfied the protected-activity and adverse-action prongs of her prima facie burden, but agree with the district court that Ms. Unal failed to satisfy the causation prong.

A plaintiff establishes a causal connection between her protected conduct and the adverse employment action by proffering "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005) (internal quotation marks omitted). Although evidence of "very close[]" temporal proximity will provide compelling evidence of retaliation, and, in some cases, may be sufficient on its own, *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007), a plaintiff must also show that the person who engaged in the adverse employment action was aware of the protected activity, *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (noting that some cases "accept mere temporal proximity between an employer's *knowledge* of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case" (emphasis added)); *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) ("An employer's action against an employee cannot be *because* of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition.").

Here, although Ms. Unal demonstrated temporal proximity of just four days between the submission of her letter to LAPS administration and Ms. Vandenkieboom's issuance of the disciplinary letters, at summary judgment, Ms. Unal failed to prove Ms. Vandenkieboom knew of the protected activity when she issued the disciplinary letters. Instead, Ms. Unal argued that close temporal proximity alone was enough to show causation. For the first time on appeal, Ms. Unal

24

has produced evidence she argues demonstrates Ms. Vandenkieboom was, in fact, aware that Ms. Unal had sent LAPS administration a letter complaining of discrimination when she issued the disciplinary letters. Specifically, Ms. Unal relies on the deposition testimony of Assistant Superintendent Dean, which Ms. Unal argues shows Ms. Dean spoke with Ms. Vandenkieboom about Ms. Unal's letter to LAPS before Ms. Vandenkieboom issued the disciplinary letters.

Regardless of whether Ms. Dean's deposition testimony demonstrates knowledge, Ms. Unal failed to present this evidence to the district court in her opposition to summary judgment. Although Ms. Dean's deposition testimony was made part of the record in the district court, at summary judgment, Ms. Unal failed to cite to the "particular parts" of the record that supported her causation argument. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . ."). The district court was therefore under no obligation to parse through the record to find the uncited materials. *See id.* 56(c)(3) ("The court need consider only the cited materials."). Because Ms. Unal's summary judgment evidence did not demonstrate the requisite knowledge, she failed to prove causation, and we must affirm the district court's grant of summary judgment to Defendants on this claim.

## 2. Relocation to Portable Classroom

Ms. Unal next argues she engaged in protected activity by filing a formal grievance with the district and Defendants retaliated against her by barging into her classroom unannounced, telling her Ms. Vandenkieboom would remain her

25

supervisor, and announcing her class would be immediately relocated to a portable classroom outside the building. The district court agreed Ms. Unal's formal grievance was a protected activity and Ms. Unal had shown a causal nexus. But the court concluded Defendants' conduct did not constitute a materially adverse employment action.

The Supreme Court in *Burlington Northern & Santa Fe Ry. Co. v. White* defined a materially adverse action as one that might "dissuade[] a reasonable worker from making or supporting a charge of discrimination." 548 U.S. 53, 68 (2006). The Court intentionally "phrase[d] the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69. The Court stressed the importance of context. *Id.* By way of example, the Court explained that although a "change in an employee's work schedule may make little difference to many workers," it could "matter enormously to a young mother with school-age children." *Id.* Likewise, "[a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Id.*

Notwithstanding this context-specific approach, a plaintiff must nonetheless demonstrate the adverse action was material. *Id.* at 69–70. The materiality requirement reinforces the antiretaliation statutes' focus on "prevent[ing] employer interference with unfettered access to [the statutes'] remedial mechanisms," and does

26

so by "prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Id.* at 68 (internal quotation marks omitted). Thus, "petty slights, minor annoyances, and simple lack of good manners" will generally not be material. *Id.*

Returning to the facts before us, we consider whether a reasonable jury could conclude that Defendants' conduct in interrupting Ms. Unal's classroom unannounced, reneging on their commitment to provide her a new supervisor, and ordering her to relocate to the portable classroom could deter a reasonable employee from engaging in protected conduct. We have yet to address whether a workspace relocation may support a retaliation claim in light of the relaxed adverse-action standard set forth in *Burlington Northern*; at the very least the parties have not directed us to such a case and our research has found none.[6] We did, however, confront such a situation in a case that predates *Burlington Northern*. In *Stover v. Martinez*, we ruled that an employer's decision to move plaintiff to an isolated office

---

[6] We have, however, addressed whether an office relocation constituted a materially adverse action in the context of a discrimination claim and concluded that it did not. *Nettle v. Cent. Okla. Am. Indian Health Council, Inc.*, 334 F. App'x 914, 926 (10th Cir. 2009). But because *Burlington Northern* did not alter the adverse-action standard for discrimination claims, *see Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (explaining that although *Burlington Northern* relaxed the standard for proving adverse action in the retaliation context, "it had no similar effect on our discrimination jurisprudence"), *Nettle* provides little guidance for our decision in this case. Indeed, unlike adverse actions in the retaliation context, which broadly include all conduct that would deter a reasonable employee from engaging in protected activities, adverse actions in the discrimination context are limited to actions "that affect employment or alter the conditions of the workplace," including "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.*

did not constitute a materially adverse action for purposes of retaliation, even when that conduct was aggregated with other negative actions, including plaintiff's receipt of low-level work and lower-than-normal employment reviews and defendant's failure to promote plaintiff or award her anticipated recognition. *Stover*, 382 F.3d at 1075.

Other circuits have addressed workspace relocations since *Burlington Northern*, and most have ruled that such changes were not materially adverse in the given context. *See, e.g.*, *Roncallo v. Sikorsky Aircraft*, 447 F. App'x 243, 245–46 (2d Cir. 2011) ("[A] temporary move from an office to a cubicle, consistent with [defendant's] office allocation policy . . . does not constitute a materially adverse employment action."); *Fercello v. Cty. of Ramsey*, 612 F.3d 1069, 1079 (8th Cir. 2010) ("[Plaintiff] has offered no evidence that the relocation of her office rendered her unable to complete her duties or that it otherwise interfered with her employment to an extent that would deter a reasonable person from making a harassment claim."); *see also Lockridge v. Univ. of Me. Sys.*, 597 F.3d 464, 473 (1st Cir. 2010) (ruling that denial of request for better office space was not a materially adverse action because it "left her in no worse a position than that held by similarly situated faculty members").

We acknowledge that in some cases, both pre- and post-*Burlington Northern*, courts have held that a workspace relocation was materially adverse. *See, e.g.*, *Novak v. England*, 316 F. App'x 671, 673 (9th Cir. 2009) (reversing summary judgment where there was "a genuine issue of material fact as to whether [plaintiff] suffered an

28

adverse employment action when he was . . . reassigned to perform menial work that fell below his job classification and relocated to an isolated overflow area" (citation omitted)); *Signer v. Tuffey*, 66 F. App'x 232, 236 (2d Cir. 2003) (concluding that relocating plaintiff's office to "an out-of-the-way office next to the building's garbage collection area," together with evidence of a reduction in plaintiff's work responsibilities "was an adverse change in [plaintiff's] employment conditions"); *Chuang v. Univ. of Cal. Davis, Bd. of Tr.*, 225 F.3d 1115, 1125 (9th Cir. 2000) (ruling that "the relocation of [plaintiffs'] laboratory space unquestionably qualifies as an adverse employment action" where the relocation disrupted plaintiffs' research, caused them to lose experimental subjects and grants, and resulted in broken equipment). But in each of these cases, either the relocation itself or other adverse conduct done in concert with the relocation negatively altered the employees' work conditions or interfered with their ability to complete employment duties.

In this case, Ms. Unal has failed to come forward with evidence showing her relocation to the portable classroom had such a disruptive effect. Although Defendants made the decision to move her classroom shortly before the end of the school year, the record demonstrates that Ms. Unal did not, in fact, move until the school year ended. Thus, the move did not interfere with her teaching responsibilities. Ms. Unal has likewise failed to show that, apart from its location, the portable classroom was in any way inferior to a regular classroom or that teaching in the detached location would undermine her ability to perform her work duties. Nor

29

has she shown that the move was contrary to school policy or that Defendants did not similarly relocate other teachers.

Although Ms. Unal has demonstrated that Defendants announced their decision to relocate her classroom in concert with other allegedly retaliatory conduct—i.e., entering her classroom unannounced and reneging on the agreement to assign her a new supervisor—we are not convinced this conduct constituted anything more than "petty slights, minor annoyances, and simple lack of good manners." *Burlington N.*, 548 U.S. at 68; *see A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011) (rejecting a retaliation claim based on a reneged promise because "retracting a gratuitous promise does not amount to a discriminatory act or an adverse action"); *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009) (concluding that plaintiff's reassignment to a new supervisor was not a materially adverse action because "[h]er duties were unchanged, and there is no evidence that she suffered a diminution in prestige or change in standing among her co-workers"). Because Ms. Unal has not shown Defendants' conduct would result in any negative consequences beyond mere inconveniences, we cannot say this conduct would deter a reasonable employee from engaging in protected activity. We therefore affirm the district court's grant of summary judgment on this claim.

## 3. Failure to Accept Ms. Unal's Response to Notice of Intent to Rehire

Finally, Ms. Unal challenges the district court's summary judgment on her claim that Defendants retaliated against her for filing the EEOC charge of discrimination by initially rejecting her response to the notice of intent to rehire. The

30

district court concluded that although Ms. Unal's EEOC charge was a protected activity and Defendants' withdrawal of the offer to renew Ms. Unal's teaching contract was a materially adverse action, Ms. Unal failed to prove causation. Because Ms. Unal filed her EEOC action six months before Defendants rejected her response to the notice of intent to rehire, the district court ruled Ms. Unal could not rely on temporal proximity alone to show causation. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) ("[U]nless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation."); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (ruling that a three month period is too long to infer causation from temporal proximity). And because Ms. Unal provided no other evidence of causation, the district court ruled she failed to satisfy her prima facie burden as to this claim.

On appeal, Ms. Unal contends the clear discrepancy between the date reflected on the notice of intent and the postmark date would have made it obvious to Defendants that she timely responded to the notice. Thus, she reasons their timeliness excuse is fabricated and demonstrates a causal connection. But even if the belated postmark date is sufficient to show causation, Defendants have provided a nonretaliatory justification for the adverse action, and Ms. Unal has not proven that justification is mere pretext. Specifically, Defendants argue that when they made the initial decision to reject Ms. Unal's response, they determined the response was untimely based solely on the date listed on the notice of intent to rehire itself and

31

were not aware it had been mailed days later. As soon as Ms. Unal informed Defendants of the late postmark date, they rescinded the termination and renewed her contract. Defendants thus argue that they did not fabricate the timeliness issue; instead, they argue it was based on an honest mistake.

Ms. Unal has not produced evidence rebutting Defendants' assertion that they were unaware of the late postmark date; nor has she shown that Defendants' proffered rationale was otherwise "so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Stover,* 382 F.3d at 1071. Ms. Unal has therefore failed to show that the decision to reject her acceptance letter was caused by anything other than a clerical error. Accordingly, because Ms. Unal has not shown Defendants' justification was mere pretext, we affirm the district court's grant of summary judgment on this issue.

## IV.   CONCLUSION

For the reasons stated above, we **REVERSE** the district court's grant of summary judgment in favor of Defendants on Ms. Unal's hostile-work-environment claim, but we **AFFIRM** summary judgment on the retaliation claims.

Entered for the Court


Carolyn B. McHugh
Circuit Judge

32